FRICK COMPANY *vs.* NEW ENGLAND INSULATION CO.
(and a companion case[1]).

Suffolk. December 3, 1963. — May 8, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Evidence,* Extrinsic affecting writing, Business record. *Contract,* What constitutes, Implied contract.

As matter of law a contract for sale and installation of certain equipment, was made where it was undisputed that, after the prospective buyer had signed in triplicate a written contract prepared by the seller company's local representative and stating that it was "not binding until approved and accepted by . . . [the seller] at its home office," the buyer received one of the originals of the contract back from the seller indorsed as accepted by the seller but expressly subject to certain changes indicated thereon, and that the buyer thereupon signed an accompanying card reciting that the buyer acknowledged "receipt of approved and accepted copy of contract" and made a payment then required by the contract, and subsequently made other payments and gave promissory notes called for by the contract. [466–467]

Evidence of negotiations between an agent of a prospective seller of refrigerating equipment and the prospective buyer, in which there were

---

[1] The companion case is New England Insulation Co. *vs.* Frick Company.

references to engineering services to be furnished by the seller and the buyer indicated to the seller's agent that what was desired was equipment capable of freezing a specified quantity of beef per day, followed by the execution of a complete, formal written contract for sale and installation of certain equipment containing no provision respecting such capability of the equipment and expressly negating any warranties not contained therein, did not warrant a conclusion that there was an independent contract between the parties whereby the seller was to engineer, select and specify equipment having such capability, and the parol evidence rule precluded recovery by the buyer upon a claim against the seller for breach of agreement to furnish such engineering services. [467–468]

Evidence did not warrant a finding that, after the making of a written contract for sale and installation of refrigerating equipment containing no provision requiring the equipment to be capable of freezing a certain quantity of beef per day, the seller undertook to do what was necessary to ensure such capability of the equipment in consideration of the buyer's signing certain completion certificates or in consideration of the buyer's giving notes called for by the written contract before the time specified therein for giving them. [468]

At the trial of cross actions between a seller and the buyer of certain equipment, a relevant bill purporting to be one sent by the seller to the buyer was sufficiently authenticated by the evidence to be admitted against the seller. [468–469]

In an action by a buyer against the seller of equipment to be installed by the seller, the evidence warranted recovery by the buyer upon an account annexed for certain items furnished by the buyer to the seller's workmen to enable them to install the equipment as required. [469]

CONTRACT. Writ in the Superior Court dated September 14, 1960.

CONTRACT OR TORT. Writ in the Superior Court dated October 31, 1960.

The actions were tried together before *Tomasello, J.*

*Clyde G. Patten* for Frick Company.

*Irvin M. Davis (Peter F. Davis* with him) for New England Insulation Co.

WHITTEMORE, J. These are cross actions, tried together, arising out of contracts made in 1958 for the sale by Frick Company (Frick) to New England Insulation Co. (Insulation) of refrigeration machinery and apparatus and its installation by Frick in Insulation's plant in the city of Lawrence.

Frick sued Insulation for a balance of $77,679.60 and interest due under written contracts or on a series of notes

given pursuant thereto. The jury found for Insulation in this action.

Insulation had verdicts on five of the counts in its action but was awarded no damages on the three counts next described. Count 1 alleged breach of contract to engineer, select, and specify a blast freezer for installation in Insulation's plant capable of freezing 200,000 pounds of beef a day on a continuous basis. Count 6 was for breach of contracts to install equipment and machinery. Count 9 was for breach of a contract alleged to have been made when Insulation signed completion certificates in consideration of Frick agreeing to do whatever was necessary to give the installed plant the capacity to freeze 200,000 pounds of beef a day. Insulation had a verdict of $812 on count 8, also for breach of contract. That count averred that in consideration of Insulation's having executed in advance the promissory notes called for by the written contract on which Frick had declared, Frick modified its undertakings to include installation of a plant of 200,000 pounds a day capacity. Under count 10 the jury awarded Insulation $3,458.88 on an account annexed for equipment furnished by Insulation to Frick and for an ammonia pump installed by Insulation at a later time. The judge ordered verdicts for Frick on the remaining counts (2, 3, 4, 5, and 7) of Insulation's declaration.

The actions are before us on Frick's exceptions.

Frick contends in support of its exceptions that there was error in the following: (1) The admission of testimony as to the negotiations and discussions preliminary to and in the course of the signing and delivery of the written contracts. (2) The admission of a bill from Frick to Insulation without proof of authenticity. (3) and (4) The denial of Frick's motions for directed verdicts on counts 8 and 10. Frick contends, as to (1), that the parol evidence rule barred the testimony. Insulation has argued the effect of the parol evidence rule and also the issue of the authority of Frick's agent.

Frick also excepted to the denial of its motions for directed verdicts under counts 1, 6, and 9 of Insulation's

declaration and to the denial of its motion for a directed verdict for the plaintiff in its action against Insulation. Frick excepted to a portion of the judge's charge and to the denial of motions for a new trial of each action. Although Frick's brief does not expressly deal with the exceptions referred to in this paragraph, we consider these exceptions in relation to the exceptions argued. See Rule 13 of the Rules for the Regulation of Practice before the Full Court (1952), as amended, 345 Mass. 787.

The jury could have found these facts: Insulation's negotiations were with Ralph S. Ziehmn, the Boston district manager for Frick, who was authorized to do and did engineering work for Frick. "Preliminary engineering . . . was part of his job." Frick "rarely offers independent engineering service, separate and apart from the sale of a machine." Ziehmn had died prior to the trial. Insulation's president, Arthur C. Swanson, told Ziehmn that Insulation had the problem of freezing 200,000 pounds of boned beef every twenty-four hours on a continuous basis and asked if Frick was qualified to handle it. Ziehmn replied that Frick was qualified. Swanson said he wanted someone to assume the full responsibility and Ziehmn said he would accept it after seeing what was needed; there would be no charge for engineering services if Insulation purchased "the equipment from us that we recommend." There was further talk between Swanson and Ziehmn. Ziehmn submitted a bulletin issued by Frick that referred to the "complete engineering service that goes with Frick air cooling units" and stated that "[t]rained refrigerating engineers advise you on every requirement of the installation, in advance." Ziehmn submitted a "plant survey" which stated that the "product load" was "freeze 200,000 pounds beef in 24 hours."

On July 16, 1958, Swanson signed, in triplicate, the main contract on which Frick relies. It had been prepared by Ziehmn, was on Frick's printed form, and made no mention of an obligation to furnish equipment to freeze 200,000 pounds a day.

The contract recited that it superseded an earlier one and it provided for crediting against the total price of $107,476 the sum of $4,998.50 paid under the earlier contract. A portion of the balance was to be paid in two instalments, the second to be payable upon notice that Frick was ready to ship. The remaining sum, $70,800, was to be paid by twenty-four notes to be delivered when the first shipment was made.

The contract signed by Swanson provided that it was "not binding until approved and accepted by Frick Company, at its Home Office." Insulation on or in due course after August 11, 1958, received a letter from Ziehmn enclosing one of the originals of the July 16 document indorsed as accepted by Frick on August 2, 1958, but expressly subject to changes made in red ink. With the letter was a card to be signed by Insulation. The chief red ink change caused the contract to call for nine special cooling units, having a total basic rating of 90,000 B. T. U. per hour per degree instead of ten units with a total basic rating of 93,500 B. T. U. Noting the red ink changes, Swanson called Ziehmn to his office and referred to the changes saying that he did not care about the number of units. "You are designing, engineering, [and] installing this plant to freeze 200,000 pounds in twenty-four hours, every twenty-four hours . . . . I am asking for no reduction in price. What I want is the result." Swanson then signed the card. It read: "This will acknowledge receipt of approved and accepted copy of contract with you for refrigerating equipment, as returned to us with your letter of August 11, 1958." Swanson gave Ziehmn a check on that day for the amount then due under the contract and in due course made other payments called for by the contract. Swanson signed and delivered the twenty-four notes dated September 10, 1958. The equipment had not then been shipped.

There were two supplementary contracts: One dated August 6, 1958, for equipment to cost $7,584, and the other dated August 20, 1958, for equipment to cost $810.

The contract of July 16, 1958, the contract of August 6,

1958, and the superseded earlier contract, contained disclaimers of all express and implied warranties not contained therein, a notice that no agent had authority to alter the written contract, and a recital that the writing contained the entire contract. They provided also that any later agreement to supply additional equipment would be subject to their terms. The August 20, 1958, contract contained like provisions except for the disclaimer of warranties.

Each of these contracts contained one year warranties against defects in materials or workmanship. A warranty in the July 16, 1958, contract was that the equipment would have a capacity stated in engineering units. Both the July 16 and August 6, 1958, contracts contained provisions characterizing all warranties as collateral and providing that the seller should not be liable on the warranties if the buyer defaulted in payment. Damages for breach of warranty were limited to the cost of correcting defects, and consequential damages were barred.

The July 16 contract called for "automatic defrost system" and there was testimony that the system installed required manual operation. The equipment installed fell far short of capacity to freeze 200,000 pounds of beef a day.

The cases are governed by G. L. c. 106 and the complementary common law as in force prior to enactment of the Uniform Commercial Code. St. 1957, c. 765, §§ 1, 19, 21.

1. We consider first the evidence of the making of a written contract in which all preceding agreements were integrated. Swanson's talk with Ziehmn on or about August 11, 1958, could have been found to have been notice to Ziehmn that Insulation was relying on Ziehmn's earlier words as constituting an undertaking by Frick to install machinery to freeze 200,000 pounds of beef every twenty-four hours. What Insulation did, however, according to the undisputed evidence, effectively closed the contract on Frick's terms as a matter of law. Swanson's signing and delivery of the card acknowledging receipt of the modified contract, his contemporaneous delivery to Ziehmn of the check for the amount due under the contract, Insulation's

other payments under the contract, and its signing and delivery of the notes, taken together, were in law acceptance of the contract as modified. See *Vasen Mfg. Co. Inc.* v. *Slate,* 286 Mass. 289. The writing informed Insulation that Ziehmn had no authority to alter the writing, and that Frick understood that it had Insulation's agreement that the entire contract was therein. Although the card itself was somewhat ambiguous, Insulation notified Frick by the card, the check and the notes that it was agreeing to that writing. It is inconsequential that Swanson, when he did acts reasonably referable, in Frick's view, only to that writing, may have thought the written contract had been enlarged.

It follows that there was error in the judge's charge, to which exception was taken, that the jury could find whether in view of the card signed by Swanson and "any other evidence" a contract was made.[2]

2. As a rule of substantive law the application of the parol evidence rule can be raised at the close of the evidence by a motion to strike or limit testimony, by properly framed requests for instructions or objections to instructions, or by motions for directed verdicts if they raise the issue. See *Dekofski* v. *Leite,* 336 Mass. 127, 130; *Mears* v. *Smith,* 199 Mass. 319.

A verdict should have been directed under Insulation's count 1 because of the parol evidence rule. The sentence in the bulletin "When you invest in a Frick unit you get the benefit of all our experience, plus an unparalleled engineering service," was notice that the service was in connection with a purchase of Frick equipment, not under a collateral agreement. The bulletin expressly informed Insulation that the engineering service would be rendered in advance of the purchase, but it did not suggest that there would be

---

[2] Frick excepted to this part of the charge: "If you find that there was any material change in the proposed contract after it had been signed by one party, but before it was signed by the other, it would convert it into a counter offer, which would not make it a contract until accepted by the first party who signed it. Based upon your interpretation of Exhibit 12 relating to the words 'accepted and approved' and any other evidence presented, you are to determine if such an acceptance took place and as to whose acceptance it might have been. If such acceptance took place then it would act as a modification of the proposed contract and become a part of it."

any undertaking other than in the purchase contract. No consideration is shown to have been given by Insulation apart from the written contracts. The evidence does not warrant the conclusion of an independent contract for engineering services.

Although verdicts should have been directed for Frick under counts 8 and 9, see point 3, this was not because of the parol evidence rule. The oral contracts alleged in these counts to have been made subsequent to the writings would not have been barred by the writings. *Thomas* v. *Barnes,* 156 Mass. 581, 584.

The erroneous charge, see point 1, did not directly deal with the parol evidence rule, but the arguments in respect of the rule have put in issue whether a contract was made in August, 1958, and the correctness of the charge that the jury could find that a contract was not made. Insulation has fully argued the point and the correctness of the charge.

3. A verdict should have been directed on count 8 of Insulation's declaration. The evidence was that Insulation did sign and deliver the notes dated September 10, 1958, before the date when they were required under the contract of July 16, 1958. The equipment was not shipped until October 3, 1958. Thus Insulation became obligated, as its brief points out, for $226.16 more interest than by the written terms it would have been required to pay. The evidence was insufficient to permit the jury to conclude that the notes were delivered as consideration for Frick's undertaking to do additional work and supply additional equipment to make the equipment perform as Swanson had told Ziehmn was required.

A verdict should also have been directed under count 9 as the evidence was insufficient to show that the alleged agreement was made.

4. Frick argues that the paper offered as its bill for nine special freezing units "AUF 155" was insufficiently authenticated. The written contract called for nine units AUF 187 Special. AUF 187 units were larger than AUF 155 units. The bill was relevant as a step in an attempt to prove fail-

ure to deliver the equipment called for. The bill was sufficiently identified as from Frick. An officer of Frick recognized it as a bill or statement on Frick's form. The date of shipment and the amount due on Frick's sales record (October 3, 1958) correspond with the invoice, as do the order numbers. The terms are those set out in the July 16, 1958, contract. The bill bears on its face Insulation's stamp "RECEIVED OCT 10 1958 New England Insulation Co.," this being the stamp customarily used. Swanson testified that the bill was received with a letter on October 10, 1958.

5. There was no error in refusing to direct a verdict under count 10 of Insulation's declaration. The jury could have found that some of the items in the account annexed were furnished Frick's workmen to enable them to install the equipment that Frick was obliged to install. Insulation's general manager testified that these were furnished to Frick's men while they were working in the plant. It could be inferred that Frick's men needed those items as incidental to the installation and had implied authority to procure them.

6. There must be a new trial of Frick's action and count 6 of Insulation's action. The apparently offsetting verdicts suggest that erroneous findings under counts 1, 8 or 9 of Insulation's action may have affected the verdicts under the counts in either action founded in or related to the written contracts.[3] We need not pause to consider whether such an issue is presented. See *Phillips* v. *Larson,* 323 Mass. 87, 91. In any event the incorrect charge in respect of the making of the July 16 contract underlay the jury's consideration of those counts.

7. Frick's exceptions are sustained except as to the refusal to direct a verdict under counts 6 and 10 of Insulation's declaration, the admission of Frick's bill for freezing units and Frick's motion for a directed verdict in its favor on its declaration, as to which the exceptions are overruled.

[3] The writer of Insulation's brief admits that "he cannot explain how the jury arrived at the *amount* of damages — $812 — awarded by the jury under count 8" and suggests the possibility of a new trial under count 8 on the issue of damages.

The verdicts for Insulation under counts 1, 6, 8, and 9 of Insulation's declaration are vacated. Verdicts are to be entered for Frick on counts 1, 8, and 9 of Insulation's declaration. The case is to stand for trial on Frick's declaration and Insulation's count 6.

*So ordered.*