## Commonwealth vs. George J. Nardi.

Plymouth. May 8, 2008. - September 25, 2008.

Present: Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Homicide. Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Capital case, Confrontation of witnesses, Instructions to jury. *Evidence,* Expert opinion, Hearsay, Public documents, Best and secondary, Authentication of document.

At a murder trial, the admission in evidence of the testimony of a pathologist regarding the cause of the victim's death, based on an autopsy performed by a second pathologist who was unavailable to testify at trial, did not violate the defendant's right, pursuant to the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, to confront witnesses against him, where the first pathologist testified to his own expert opinion, which was based on a permissible foundation, and the defendant had ample opportunity to cross-examine him [387-391]; moreover, although the first pathologist's testimony, on direct examination, regarding the findings in the autopsy report was error because it was testimonial hearsay, the error, which was not preserved, did not create a substantial likelihood of a miscarriage of justice, where the most important medical evidence, i.e., the testifying pathologist's opinion as to the cause of death, was properly admitted, and where the defendant's expert made use of and referred to the findings in the autopsy in his testimony [391-396].

At the trial of an indictment charging the defendant with murder in the first degree, the judge did not err in admitting in evidence a photocopy of a check on which the defendant allegedly forged the victim's signature fifteen days after her death, where a witness identified the photocopy as a copy of the check she had cashed for the defendant, and identified her own signature on that copy, and where the Commonwealth was not trying to prove the truth of the contents of the check. [396-397]

At a murder trial, the judge was not required to include in her instruction to the jury on deliberate premeditation a description of deliberate premeditation as an intent to kill, combined with planning how to effectuate that desire and an evaluation of the "pros and cons" of proceeding. [397-398]

Indictment found and returned in the Superior Court Department on May 30, 2003.

The case was tried before *Linda E. Giles,* J.

*Stewart T. Graham, Jr.,* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

CORDY, J. In the days preceding and following Christmas, 2002, Dianne Barchard failed to show up for work or maintain contact with her friends. After a missing person report was filed, her body was found in an advanced stage of decomposition on the floor of her bedroom in an apartment she shared with her son George Nardi. Nardi was subsequently indicted for her murder and, after a six-day trial, was found guilty of murder in the first degree on the theory of deliberate premeditation.

On appeal, Nardi contends that his right, pursuant to the Sixth Amendment to the United States Constitution, to confront the witnesses against him was violated when a pathologist, called by the Commonwealth, was permitted to testify to the autopsy findings of another pathologist who performed the autopsy but was unavailable to testify at the time of trial, and to his own opinion regarding the cause of Barchard's death based on those findings. Nardi also claims that the admission in evidence of an unauthenticated, allegedly forged check was prejudicial error, and that the trial judge failed to explain and distinguish the concepts of deliberation and premeditation in her instructions to the jury. We affirm the conviction and decline to grant relief under G. L. c. 278, § 33E.

1. *Trial.* In support of its claim that Nardi intentionally killed his mother sometime prior to Christmas, 2002, the Commonwealth presented the following evidence, which the jury could have concluded was credible. In the fall of 2002, thirty-seven year old George Nardi lived in a small, second-floor apartment with his fifty-nine year old mother, Dianne Barchard. While Barchard worked full time at a local Dunkin' Donuts, Nardi worked intermittently installing carpets, or at other odd jobs. He spent his time and what little money he had at the Bridgewater Citizen Club drinking and playing Yahtzee.

The mother and son had a stormy relationship. Aggravated by her constant nagging him to pay bills, Nardi called her vulgar names both to her face and in conversation with his friends. In October, 2002, Nardi was charged with driving while under the influence after an accident in which he damaged his motor vehicle beyond repair. Without transportation, Nardi was unable

to work and began drinking more heavily. Tired of supporting him, Barchard pressured Nardi to find a job. During this time, arguments between Nardi and Barchard over money escalated.

By December, 2002, Barchard had told a number of her friends and neighbors that she planned to move into elderly housing when she became eligible in January, 2003; that Nardi would be ineligible to move with her; and that she intended to ask Nardi to move out of the apartment after the holidays. In response to inquiries of what she would do if he refused, Barchard said she would get a protective order. Nardi was aware of his mother's plan to move and expressed anger about it to his friends.

On December 14, 2002, Barchard took the train to Boston with Grace Levesque, her downstairs neighbor, landlady, and friend, to see a performance of the Nutcracker. At the theater, when Barchard reached the top of the stairs she expressed some leg pain and shortness of breath; Levesque jokingly commented that Barchard looked "like a heart attack ready to happen." The following afternoon, Levesque saw Barchard alive for the last time, taking her dog for a walk. Having not seen or heard from Barchard, a concerned Levesque telephoned her apartment several times over the course of the next two weeks. Each time, Nardi answered and gave a different reason why Barchard was unable to speak with her. Stephen Souza, Barchard's other son (Nardi's stepbrother), who regularly telephoned his mother several times a week, received similar excuses from Nardi during this same period when he telephoned to speak to his mother.

Thomas Keaney, Barchard's neighbor and her manager at Dunkin' Donuts, also telephoned Barchard's apartment after she failed to show up for work on December 16. Nardi answered the telephone and told Keaney that Barchard was sick and unable to come to work. When Keaney encountered Nardi on Christmas Day, Nardi told him that his mother had gone "down the Cape" (to Souza's house in Bourne) to recuperate. On December 27, Keaney spoke with Levesque about Barchard; both had noticed that her bedroom window was wide open in the middle of the winter, which was unusual because "she hated to be cold."

Traditionally, Nardi got together with some of his friends on Christmas Eve to exchange small gifts. However, in 2002, Nardi told his friends that he was not going to celebrate the holidays

because "everything sucked." Despite his earlier remarks, Nardi appeared at his friends' house on Christmas Eve with a bottle of his favorite drink and proposing a toast. He also brought gifts, including a gold anklet chain, a pair of diamond earrings, and a Nautica wallet, which were much more lavish than anything he had given in the past. At trial, Levesque testified that she was with Barchard when she purchased the gold anklet chain and Nautica wallet as gifts for her daughter-in-law and boss.

Nardi reappeared at his friends' house on December 26 and 29, looking for leftovers and complaining that his mother had not cooked Christmas dinner. He also asked his friend Paula Nee if she could cash a check his mother wrote for him because he did not have a vehicle or a driver's license. Having done this in the past, Nee agreed and cashed the check, which was signed in Barchard's name and dated December 30, 2002.[1]

On the same day Nee cashed the check, Levesque telephoned the police to report Barchard as a missing person. While cross-checking the address for Barchard's apartment, the police located a default warrant for Nardi's arrest.[2] They proceeded to the apartment and arrested a disheveled looking Nardi on the stairwell. When asked his mother's whereabouts, Nardi told police that Barchard was staying with Souza in Bourne. Nardi then consented to the police request to check the apartment. On entering the apartment, the police observed a locked door off the kitchen area with a flannel shirt tucked like a runner at the threshold. Believing Barchard to be in the locked room, the police forced the door open with a door jamb spreader. Immediately, the smell of decaying flesh wafted from the bedroom. Inside, police found Barchard's decomposing body covered by a blue blanket on the bedroom floor.

Subsequent forensic examination of the apartment revealed human blood stains, both visible and latent, in the kitchen, mainly near the washing machine, on a mop head, on Nardi's left foot,

---

[1]At trial, Nee identified a copy of the check that was admitted in evidence in lieu of the original, which was in the bank's custody. In his testimony, Nardi also identified the copy of the check, and admitted that he had signed his mother's name to it.

[2]The arrest warrant was issued after Nardi failed to appear in court on the charge of driving while under the influence in October.

and in a trail pattern from the kitchen to Barchard's bedroom. Testing revealed that the deoxyribonucleic acid (DNA) profile obtained from the stain on Nardi's foot indicated a mixture of DNA from at least two individuals; Barchard matched the major profile and Nardi was a potential contributor to the minor profile.

Doctor James Weiner from the medical examiner's office conducted an autopsy on Barchard's body on December 31, 2002, and January 1, 2003. By the time the case went to trial, Dr. Weiner had retired to Florida and had a medical condition that prevented him from traveling.[3] In his place, the Commonwealth called Dr. Edward McDonough, deputy chief medical examiner for the State of Connecticut, to testify about the results of the autopsy and the cause of death. In preparation for his testimony, Dr. McDonough reviewed crime scene reports, the autopsy report Dr. Weiner had prepared, Dr. Weiner's notes and diagrams, photographs taken at and before the autopsy, microscopic tissue slides, and a toxicology report. He also spoke with Dr. Weiner about the autopsy, but only after looking at the factual material because he wanted to "form [his] own opinion without being subconsciously biased."

Dr. McDonough testified to injuries observed on Barchard's face and neck during the course of the autopsy. He was then asked what conclusions and opinions he drew from those observed injuries, and opined to a reasonable degree of medical certainty that the facial injuries were consistent with a hand being placed over Barchard's mouth and nose and pressure being applied. He also testified that he "agree[d] with Dr. Weiner's assessment" that the cause of death was "consistent with asphyxia by suffocation."[4]

The crux of Nardi's defense was that Barchard was not murdered, but died of natural causes related to her heart. This defense was outlined in counsel's opening statement (made at the beginning of the trial), in which he emphasized that the medical examiner who performed the autopsy found no "bruises on the neck" (consistent with strangulation), "no garroting marks, no punctures, no blunt objects." He also told the jury that although

---

[3]The parties stipulated to Dr. Weiner's unavailability.

[4]Dr. McDonough testified that he would not use the term "consistent with" if, in his view, any particular cause of death was equal to another cause.

the medical examiner did find a small cut on Barchard's nose and two bruises near her chin, and, based on these findings, "report[ed] [in] his autopsy report [that Barchard's death was] 'consistent with asphyxiation by strangulation . . .' the medical evidence is she died of a heart attack."[5] The defense was furthered through counsel's cross-examination of Dr. McDonough and later counsel's direct examination of an expert pathologist, Dr. Mark Flomenbaum, called as a defense witness. In both of these examinations, defense counsel highlighted findings made by Dr. Weiner in his autopsy report, regarding the enlarged size of Barchard's heart and the hardening, or narrowing, of one of her main arteries.[6]

Nardi also testified in his own defense. He claimed that he woke up to find his mother dead on the kitchen floor in a pool of blood; that he was paralyzed by her death; and that he did not know what to do. He contemplated suicide, but ultimately decided he wanted to spend another Christmas with his mother. He then dragged her body into the bedroom, put a blanket over her, opened the window, locked the door, and cleaned up the blood. He did not call or tell anyone about his mother's death, and lied to those who inquired as to her whereabouts.

2. *Discussion.* The principal issue raised in this case involves Nardi's Sixth Amendment challenge to the testimony of Dr. McDonough. We therefore describe that testimony in further detail.

Dr. McDonough testified to his education, training, licensure, and certification as a physician and a pathologist; his twenty years of experience working as a medical examiner for the State of Connecticut; his responsibilities as that State's deputy chief medical examiner since 1989; his participation in 6,000 to 7,000

---

[5] In her opening, the prosecutor did not mention the autopsy report or its findings, nor did she allude to any of the testimony she expected to elicit from Dr. McDonough.

[6] Ultimately, the testimony of Dr. Flomenbaum was not helpful to the defense. Dr. Flomenbaum testified that after reviewing the autopsy report, he was initially hesitant to agree with Dr. Weiner's opinion that the cause of death was consistent with asphyxial death. However, once he reviewed all of the crime scene information, he concluded that although a heart attack could not be ruled out, he was of the opinion that Barchard's death was consistent with asphyxia by suffocation.

autopsies; his appearance as an expert witness in hundreds of court proceedings; and his involvement as a pathologist in "hundreds of cases" where death occurred as a result of some form of asphyxiation. He then explained the autopsy process, including the external and internal examination of the body and its organs, the documentation of that process, and the ultimate objective of the pathologist to come to an opinion with regard to the cause of death.

With respect to Barchard, Dr. McDonough testified about the circumstances in which he was asked to review the information gathered in the course of her autopsy, and to form an opinion with respect to the cause of her death. He also testified that he had performed similar reviews of autopsies done by others on many occasions, and had testified approximately twenty times as to his expert opinion in such circumstances.

When Dr. McDonough was asked whether he drew "certain conclusions based on the findings that Dr. Weiner noted in his autopsy report and in the diagrams . . . that [he] had an opportunity to review," defense counsel objected on Sixth Amendment grounds. While conceding that "an expert can rely on other experts," defense counsel asserted that "[t]here is no independent basis for his opinion beyond Dr. Weiner's written reports. And as such [expressing his opinion] is a violation of *Crawford* [v. *Washington*, 541 U.S. 36 (2004),] and the right to confrontation . . . ."[7] The prosecutor responded by noting that Dr. McDonough was an expert witness, "testifying based on his

---

[7]After requesting a sidebar, the defense counsel stated the grounds for his objection:

"This to me is violation of *Crawford*, [v. *Washington*, 541 U.S. 36 (2004),] right of confrontation. What we have — I wasn't clear. [The prosecutor] knows. There is no written report from this doctor to exactly know what he was going to do. But the appearance is that he has reviewed, there's three photographs and some microscopic slides, I'm not sure of what, the written reports of Dr. Weiner, as far as I can understand. And on the stand he's testifying to a written report by somebody else.

"Now, I know an expert can rely on other experts, but . . . [t]here is no independent basis for his opinion beyond Dr. Weiner's written reports. And as such, that problem is a violation of *Crawford* and the right to confrontation and I object to it."

independent assessment" of the autopsy findings, and that "he would assert his own opinion" on the matter. The judge agreed, and the objection was overruled.

Dr. McDonough proceeded to testify to the injuries to Barchard's face and neck area that were noted in the autopsy report and diagrams and that could be observed in the autopsy photographs.[8] He then testified to his opinion, to "a reasonable degree of medical certainty," that those injuries "indicate force being applied to . . . three different areas of the face," which "could not have occurred by one single [impact]," and which are "consistent with a hand being placed over a mouth and nose and pressure being applied."

Later in his direct testimony, Dr. McDonough testified that, although Barchard suffered from "typical American heart disease of someone who is fifty-nine years old," including the narrowing of one of the main arteries to the heart, a slightly enlarged heart, and a hardening of the arteries, it was his opinion that "she did not die of heart disease . . . [and that] the arthrosclerosis in this particular case was not lethal." He testified, without further objection, as to his opinion on the cause of Barchard's death: "My opinion is I agree with Dr. Weiner's assessment and how he certified the death as — the cause of death as consistent with asphyxia by suffocation." There was no motion to strike the reference to "Dr. Weiner's assessment." Dr. McDonough elaborated further, opining that Barchard's "nose and . . . mouth [were] covered and therefore [she] couldn't get oxygen through those breathing passages."

On cross-examination (in addition to emphasizing Dr. Weiner's findings regarding Barchard's heart and arteries), defense counsel questioned Dr. McDonough's familiarity with the evidence, and Dr. McDonough conceded that he had only "talked to Dr. Weiner and reviewed his file," and did not perform the autopsy himself. Dr. McDonough recalled that the autopsy report was no more than a couple of pages long, and that he was "not sure there was much else in the file." He also conceded that he was unfamiliar with Barchard's medical history, and that the records indicated that Dr. Weiner had not investigated the matter.

---

[8]The autopsy report itself was not offered or admitted in evidence.

Defense counsel also questioned Dr. McDonough regarding the extent of Barchard's injuries, specifically that she had "no broken bones . . . no trauma to the throat . . . no other injuries to any other part of the body." Dr. McDonough responded that defense counsel's observations were "correct." On being questioned whether Barchard suffered facial lacerations, Dr. McDonough stated that the autopsy described only a "contusion or . . . bruise." Finally, defense counsel attempted to ascertain whether Dr. Weiner's findings on the first day of the autopsy, December 31, 2002, matched those of his second day, January 1, 2003.[9]

a. *Dr. McDonough's opinion regarding cause of death.* Nardi

[9]Defense counsel insinuated at sidebar that a State trooper was present on December 31, 2002, and that Dr. Weiner noted no signs of trauma on that date. He indicated that he was in possession of the trooper's report that substantiated that claim, and that the trooper should be able to testify. The judge excluded the trooper as a witness, noting that it would be confusing, as the trooper "is a lay person . . . and [you] are trying to basically impeach a doctor with a lay person bystander's hearing of a comment and we don't know the circumstances of what was going on [during the autopsy] at the time." Additionally, the judge noted that the trooper's testimony could be unfairly prejudicial to the Commonwealth, which, because of Dr. Weiner's unavailability, would not be able to "explain away this perceived inconsistency," and because the trooper was not present on the second day of the autopsy.

On appeal, Nardi claims that the trooper's potential testimony supports his argument that Dr. McDonough's testimony violated his right to confrontation because he was unable to cross-examine Dr. Weiner regarding what occurred during the autopsy. The record appendix includes the trooper's report, the contents of which do not establish that Dr. Weiner initially reached one conclusion regarding Barchard's death on the first day of the autopsy, and then altered that conclusion on the second day. Instead, the trooper's report (dated January 16, 2003, more than two weeks after the autopsy), noted that on the first day of the autopsy, Dr. Weiner "advised [the officers who were present] of an injury to the bridge of the nose," and made incisions into the cheeks of Barchard to determine whether there were any signs of trauma to the cheeks or jaw. The trooper's report states, "According to Dr. Weiner, the decomposition on the face of the body made it difficult to detect bruises in that area," and he did not initially locate those bruises, but was able to on reexamination the next day. Nardi's own expert testified that this sequence was not contradictory, but rather quite common: "part of the autopsy is blunt trauma . . . . There is often the ability to better visualize injuries the day after the autopsy is completed. And if there is any ambiguity, it's standard to go ahead and do that. [The trooper's] report indicates that a second examination was done by the same doctor after the main autopsy was over."

first contends that the admission of Dr. McDonough's opinion regarding the cause of death, based principally on an autopsy which he neither performed nor attended, violated Nardi's right to confrontation as protected by the Sixth Amendment and art. 12 of the Massachusetts Declaration of Rights.[10] Essentially, Nardi argues that admitting Dr. McDonough's opinion regarding the cause of death was tantamount to admitting Dr. Weiner's testimony without the opportunity to cross-examine him. We disagree. Dr. McDonough, a medical examiner with over two decades of experience, testified to his own expert opinion, and did so based on a permissible foundation. He, not Dr. Weiner, was the witness testifying to the cause of death, and Nardi was afforded ample opportunity to cross-examine him.

"[Medical] examiners, as expert witnesses, may base their opinions on (1) facts personally observed; (2) evidence already in the records or which the parties represent will be admitted during the course of the proceedings, assumed to be true in questions put to the expert witnesses; and (3) 'facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion.' " *Commonwealth* v. *Markvart*, 437 Mass. 331, 337 (2002), quoting *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531 (1986). Dr. McDonough's opinion that the cause of Barchard's death was "consistent with asphyxia by suffoca-

---

[10]The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The right to confrontation is a "bedrock procedural guarantee [that] applies to both federal and state prosecutions." *Crawford* v. *Washington*, 541 U.S. 36, 42 (2004), citing *Pointer* v. *Texas*, 380 U.S. 400, 406 (1965).

The right of a criminal defendant to confront witnesses who testify against him is also protected by art. 12 of the Massachusetts Declaration of Rights, which provides that in a criminal trial "every subject shall have a right to produce all proofs, that may be favorable to him [and] to meet the witnesses against him face to face." The State Constitution has been interpreted to provide a criminal defendant more protection than the Sixth Amendment in certain respects, see *Commonwealth* v. *Amirault*, 424 Mass. 618, 628-632 (1997), but when the question involves the relationship between the hearsay rule and its exceptions, on the one hand, and the right to confrontation, on the other hand, "the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment . . . ." *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 57 n.1 (2006).

tion" was based on his review of all three types of permissible evidence. He personally reviewed autopsy photographs and pathology samples. He reviewed evidence that had been introduced at trial prior to his testimony, specifically photographs and diagrams of the blood evidence at the crime scene, and statements regarding the fifteen-day period during which Barchard's body decomposed in her apartment. He also reviewed Dr. Weiner's autopsy report, which was a "permissible basis for an expert to consider in formulating an opinion," *Commonwealth* v. *Markvart, supra,* because "the underlying 'facts or data' contained [therein] would potentially [have been] admissible through appropriate witnesses." *Id.*[11]

We addressed similar testimony in *Commonwealth* v. *DelValle,* 443 Mass. 782, 791 (2005), where a medical examiner "testified over objection based on his review of an autopsy report, diagrams, and photographs prepared eleven years prior to trial, by another medical examiner who was no longer available to testify." The defendant in that case asserted that the expert had "strayed far beyond the scope of the autopsy report to speculate as to the cause of death and the amount of force necessary to inflict the victim's injuries." *Id.*[12] We concluded that the expert's testimony was proper, as it was "based on the nature and severity of the injuries depicted in the autopsy report and photographs, as well as his own considerable experience as a pathologist." *Id.* at 792. Although in the instant case, Nardi claims that the testimony of Dr. McDonough hewed too closely to the report and conclusions of Dr. Weiner, the same reasoning applies. Dr. McDonough considered a range of materials, in-

---

[11]The parties do not dispute that Dr. Weiner, were he available, could testify to the contents of the autopsy report. As we noted in *Commonwealth* v. *Markvart,* 437 Mass. 331, 337 n.4 (2002), "the form in which information is ordinarily transmitted to an expert witness is often one that is not itself independently admissible. For example, an expert may be provided with written witness statements, or copies of documents that do not bear the requisite authentication for admissibility, or an attorney's summary of relevant facts. It is not the form of the presentation to the expert that governs whether an opinion may be based thereon, but the nature of the facts or data contained in that presentation."

[12]The defendant in *Commonwealth* v. *DelValle,* 443 Mass. 782 (2005), did not raise a Sixth Amendment confrontation claim with respect to the expert testimony.

cluding but not limited to Dr. Weiner's autopsy report, and applied his own expertise (honed over the course of thousands of autopsies) to reach an independent conclusion regarding the cause of Barchard's death. That he reached essentially the same conclusion as to the cause of death as Dr. Weiner is of no consequence. *Id.* See *Commonwealth* v. *Hill,* 54 Mass. App. Ct. 690, 697 (2002) (although expert neither performed nor supervised DNA testing, her "opinions [that] were primarily based on her own experience and expertise as independently applied to test results" were admissible).

The fact that Dr. McDonough's expert opinion on the cause of Barchard's death was based, in large part, on findings made during the course of an autopsy that he did not perform does not infringe on Nardi's right to confrontation concerning this issue. In *Commonwealth* v. *Daye,* 411 Mass. 719, 742 (1992), the defendants argued that a bullet lead analyst relied on "facts and data gathered by others who were not before the court, thus depriving the defendants of the confrontation and cross-examination to which they were entitled." There, the expert testified that he prepared the bullet lead samples in his own laboratory, and then sent them out for further testing; his testimony was based, in part, on the results of testing conducted by others. *Id.* We concluded that "[n]othing in the record shows that [the expert's] reliance on facts and data gathered by others not before the court fell outside the [permissible bases of expert testimony established] in *Department of Youth Servs.* v. *A Juvenile, supra* at 532." *Commonwealth* v. *Daye, supra* at 743. The expert may, however, "be required to disclose the underlying facts or data on cross-examination," including that he did not personally conduct the relevant tests and examinations. *Id.,* quoting Proposed Mass. R. Evid. 705. The thrust of Proposed Mass. R. Evid. 705, as approved in *Department of Youth Servs.* v. *A Juvenile, supra,* "is to leave inquiry regarding the basis of expert testimony to cross examination, which is considered an adequate safeguard." *Commonwealth* v. *Daye, supra* at 743, quoting the Advisory Committee's Note on Proposed Mass. R. Evid. 705.

Because Dr. McDonough's opinion as to the cause of Barchard's death was "based on the nature and severity of the

injuries depicted in the autopsy report and photographs, as well as on his own considerable experience as a pathologist," *Commonwealth* v. *DelValle, supra* at 792, and because defense counsel had the opportunity to question the foundation of this opinion on cross-examination, its admission in evidence did not deprive Nardi of his right of confrontation. *Commonwealth* v. *Daye, supra* at 743.

b. *Dr. McDonough's direct testimony about the foundation of his opinion.* Nardi argues, in the alternative, that even if Dr. McDonough's opinion as to the cause of Barchard's death was admissible, his testimony on direct examination improperly included reference to many of the findings contained in Dr. Weiner's report (on which he relied in reaching that opinion); that those findings were inadmissible hearsay; and that their improper admission through Dr. McDonough's direct testimony violated Nardi's right to confrontation, resulting in prejudicial error warranting a new trial. While we agree that Dr. McDonough should not have been permitted to testify to the findings in the autopsy report on direct examination, see *Commonwealth* v. *McNickles,* 434 Mass. 839, 856 (2001),[13] we conclude that this error does not warrant a new trial.

In the wake of the United States Supreme Court's decisions in *Crawford* v. *Washington,* 541 U.S. 36 (2004) (*Crawford*), and *Davis* v. *Washington,* 547 U.S. 813 (2006) (*Davis*), we have held that the admissibility of an out-of-court statement is to be determined by a two-part inquiry. "[A] statement must first be evaluated for admissibility under normal evidence rules, i.e., whether it qualifies as a hearsay exception." *Commonwealth* v. *Burgess,* 450 Mass. 422, 431 n.6 (2008). "Then, the statement must be appraised under the criteria of *Crawford-Davis* and *Commonwealth* v. *Gonsalves,* 445 Mass. 1, 3 (2005) [, cert. denied,

---

[13]"Our approach to an expert's use of facts and data that are not themselves admitted in evidence at trial 'allows a witness to state his opinion or inferences he has drawn from the evidence without first setting out during direct examination the underlying facts or data on which the testimony is based.' " *Commonwealth* v. *Markvart,* 437 Mass. 331, 338 (2002), quoting P.J. Liacos, Massachusetts Evidence § 7.7.4, at 414 (7th ed. 1999). "Those details may be elicited during cross-examination . . . but the decision whether to do so is a strategic one left to the opposing party. The expert's direct examination may not be used to put before the jury facts that are not (and will not be) properly in evidence" (citation omitted). *Id.*

548 U.S. 926 (2006)], to determine if it satisfies the confrontation clause of the Sixth Amendment," *id.*, that is, whether the statement was testimonial. The findings testified to by Dr. McDonough fail to satisfy either part of this inquiry: they are inadmissible hearsay and testimonial in nature.

On the first issue, inadmissable hearsay, Dr. McDonough testified in some detail regarding the autopsy examination performed by Dr. Weiner and the findings he recorded in the autopsy report. Specifically, Dr. McDonough described Dr. Weiner's external and internal examinations; Dr. Weiner's findings with respect to the rigidity of Barchard's body (and the relevance of those findings to time of death); and the locations where Dr. Weiner found contusions that he concluded were consistent with facial trauma. Dr. McDonough also referred repeatedly to a diagram that Dr. Weiner drew in his autopsy report to mark the locations of that trauma, and made use of a blown up version of that diagram in his testimony. Additionally, he testified to Dr. Weiner's examination of Barchard's heart, including Dr. Weiner's findings that her heart was slightly enlarged, that one of her major arteries was sixty per cent blocked, and that she suffered from hardening of the arteries. When asked his opinion as to the cause of death, McDonough stated: "My opinion is *I agree with Dr. Weiner's assessment and how he certified the death* as . . . consistent with asphyxia by suffocation" (emphasis added).

This testimony is plainly hearsay insofar as Dr. McDonough was testifying to, and asserting the truth of, statements recorded by Dr. Weiner in his autopsy report. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 393 (1992), quoting McCormick, Evidence § 246, at 729 (3d ed. 1984) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). "It is settled that an expert witness may not, under the guise of stating the reasons for his opinion, testify to matters of hearsay in the course of his direct examination unless such matters are admissible under some statutory or other recognized exception to the hearsay rule." *Grant* v. *Lewis/Boyle, Inc.*, 408 Mass. 269, 273 (1990), quoting *Kelly Realty Co.* v. *Commonwealth*, 3 Mass. App. Ct. 54, 55-56 (1975). See *Commonwealth* v. *McNickles*, 434 Mass. 839, 857 (2001) ("We

adhere to our position that an expert witness may not, on direct examination, present the specifics of hearsay information on which she has relied in reaching her opinion").

The Commonwealth asserts, however, that there was no evidentiary error because the autopsy report about which Dr. McDonough testified fell within a well-established hearsay exception, namely that it was a public or official record. While certain elements of the report, specifically those involving "no judgment or discretion on the part of the [medical examiner]," *Commonwealth* v. *Verde*, 444 Mass. 279, 282 (2005), like toxicology test results, may be admitted under that exception,[14] others may not: "records of *investigations and inquiries* conducted, either voluntarily or pursuant to requirement of law, by public officers concerning *causes and effects* involving the exercise of *judgment and discretion*, expressions of opinion, and making conclusions are not admissible in evidence as public records" (emphasis added). *Commonwealth* v. *Slavski*, 245 Mass. 405, 417 (1923). Dr. Weiner's autopsy was undertaken as an *investigation and inquiry* into the *cause* of Barchard's death, as required by law. G. L. c. 38, § 4 ("Upon notification of a [suspicious] death . . . the chief medical examiner or his designee shall carefully inquire into the cause and circumstances of the death"). See G. L. c. 38, § 7 ("If, during the . . . investigation, the medical examiner is of the opinion that the death may have been caused by the act . . . of another, he shall at once notify the district attorney . . ."). Dr. Weiner's findings with respect to the presence and location of facial trauma, the extent of Barchard's heart disease, and his ultimate opinion as to the cause of her death, undoubtedly involved the exercise of "judgment and discretion." See *Jewett* v. *Boston Elevated Ry.*, 219 Mass. 528, 530 (1914) ("statements [in autopsy report] as to the conclusions reached and as to the cause of death were not statements of facts within the medical examiner's own observation, but of matters of opinion reached upon his medical knowledge or by way of

---

[14]The issue of the admissibility of a certificate of drug analysis is currently before the United States Supreme Court. See *Commonwealth* v. *Melendez-Diaz*, 69 Mass. App. Ct. 1114 (2007), cert. granted, 128 S. Ct. 1647 (2008). In its unpublished memorandum and order pursuant to its rule 1:28 in the *Melendez-Diaz* case, the Appeals Court substantially relied on our decision in *Commonwealth* v. *Verde*, 444 Mass. 279, 282 (2005).

inference from answers to his inquiries or from facts observed by himself or the witnesses at the autopsy"). Thus, even if parts of Dr. Weiner's report may be considered an official record, "Massachusetts common law . . . [does not permit] admission of 'evaluative reports' or opinions or conclusions in government reports." *Mattoon* v. *Pittsfield*, 56 Mass. App. Ct. 124, 135 (2002), quoting *Herson* v. *New Boston Garden Corp.*, 40 Mass. App. Ct. 779, 792 (1996).

With respect to our inquiry into whether statements made by Dr. Weiner in his report were testimonial, *Commonwealth* v. *Burgess*, 450 Mass. 422, 431 n.6 (2008), it is readily apparent that they were. Such statements are testimonial in fact, because "a reasonable person in [Dr. Weiner's] position would anticipate his [findings and conclusions] being used against the accused in investigating and prosecuting a crime." *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 3 (2005).

Because the findings and conclusions contained in Dr. Weiner's autopsy report were testimonial hearsay, and Nardi was deprived of the opportunity to cross-examine Dr. Weiner, we must determine whether their erroneous admission in evidence requires a new trial. Where an objection is properly preserved, we evaluate the admission of constitutionally proscribed evidence to determine whether it was harmless beyond a reasonable doubt. *Commonwealth* v. *Galicia*, 447 Mass. 737, 746 (2006). "If the defendant's constitutional objection was not preserved, we still review the claim to determine whether there was a substantial risk of a miscarriage of justice," *id.*, or in the case of our review pursuant to G. L. c. 278, § 33E, a substantial likelihood of a miscarriage of justice.

It is not apparent in the record that Nardi raised an objection to Dr. McDonough's testimony beyond his objection concerning the doctor's opinion as to the cause of Barchard's death, testimony that we have held did not violate Nardi's right to confrontation. While defense counsel indicated his concern that Dr. McDonough would be "testifying to," rather than relying on, "a written report by somebody else," he also expressly stated that the "*Crawford* violation" was that Dr. McDonough's opinion testimony was based entirely on an autopsy report written by Dr. Weiner. Considered by itself, it is doubtful that this objec-

tion would be sufficient to preserve the constitutional claim for the remainder of Dr. McDonough's testimony. *Commonwealth* v. *Galicia, supra.* "However, '[t]he adequacy of the objection has to be assessed in the context of the trial as a whole.' " *Id.,* quoting *Commonwealth* v. *Koney,* 421 Mass. 295, 299 (1995). Here the defense, as outlined in defense counsel's opening statement, depended on getting at least some of Dr. Weiner's findings before the jury. While there was a reason for the defendant to keep Dr. McDonough from offering his own opinion as to the cause of Barchard's death, there is little question that if Dr. Weiner's findings had not come in during Dr. McDonough's direct examination, they would have properly come in through cross-examination and redirect examination. Thus, "in the context of the trial as a whole," Nardi's objection is best understood as being limited to Dr. McDonough's opinion regarding the cause of Barchard's death and not extending to evidence of Dr. Weiner's other findings. Indeed, even when Dr. McDonough testified to his opinion on the cause of death, and did so by "agree[ing] with Dr. Weiner's assessment," there was no motion to strike the reference.[15] The objection to the testimony about Dr. Weiner's findings was not preserved.

In examining whether an unpreserved error created a substantial likelihood of a miscarriage of justice, we also look to the trial as a whole. *Commonwealth* v. *Montez,* 450 Mass. 736, 750 (2008). The most important medical evidence from the Commonwealth's point of view was Dr. McDonough's opinion as to the cause of death. That opinion was properly admitted in evidence. Dr. Weiner's subsidiary findings, however, were equally, if not more, important to the defense. That those findings were admitted in evidence in the course of Dr. McDonough's direct testimony, without objection, is consistent with the defense strategy announced at the outset of the trial. And indeed, the defense expert, Dr. Flomenbaum, made use of and referenced those findings in his testimony.[16] The admission of this testimony

---

[15]As noted, the prosecutor made no mention of the autopsy findings or to the expected testimony from the medical examiner in her opening statement. See note 5, *supra.* By contrast, in his opening, defense counsel discussed the autopsy report's findings and even told the jury that Dr. Weiner had concluded that the cause of Barchard's death was "consistent with asphyxia by suffocation."

[16]Dr. Flomenbaum testified to the contents of Dr. Weiner's autopsy reports,

did not create a substantial likelihood of a miscarriage of justice.

c. *The forged check.* Before he was arrested on December 30, 2002, Nardi telephoned a friend, Paula Nee, and asked her to cash a check for him. She agreed and drove to Nardi's apartment to pick him up. Nardi immediately gave Nee the check, which was made out to Nee, and bore the date of December 30, 2002, along with his mother's forged signature. Before cashing the check, Nee signed it. At trial, the Commonwealth introduced in evidence, over defense counsel's objection, a photocopy of the check after Nee testified that the photocopy depicted "[a] check made out to myself and I signed it for $120." On appeal, Nardi argues that the photocopy of the check should have been excluded from evidence because it was improperly authenticated and because its admission violated the best evidence rule. We review nonconstitutional errors, preserved through objection at trial, to determine whether they created prejudicial error. *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998).

"In order to be material, a thing offered in evidence genuinely must be what its proponent represents it to be. Its authenticity must be stipulated or else proved like any other fact. 'Such proof of authenticity usually takes the form of testimony of a qualified witness either (1) that the thing is what its proponent represents it to be, or (2) that circumstances exist which imply that the thing is what its proponent represents it to be.' " *Commonwealth* v. *LaCorte*, 373 Mass. 700, 704 (1977), quoting W.B. Leach & P.J. Liacos, Massachusetts Evidence 265 (4th ed. 1967). See M.S. Brodin & M. Avery, Massachusetts Evidence § 9.2, at 580 (8th ed. 2007) ("The role of the trial judge . . . is to determine whether there is evidence sufficient, if believed, to convince the jury by a preponderance of the evidence that the item in question is what the proponent claims it to be. If so, the evidence should be admitted . . ."). Here, Nee identified the

including Dr. Weiner's examination of Barchard's heart. Among other things, Dr. Flomenbaum stated that Dr. Weiner's autopsy report reflected that Barchard had a sixty per cent "narrowing of her coronary vessels," that she had "a little bit of [heart] disease," and "high blood pressure." He also testified that "[t]he only thing[s] anatomically wrong with her heart [were] a build up in her vessels and an enlargement of size. Neither of those findings would be responsible for killing 98 percent of the people who had those."

photocopy as a copy of the check she had cashed, and identified her own signature on that copy. Her uncontroverted testimony was sufficient to authenticate the photocopy of the check. See *Frick Co. v. New England Insulation Co.*, 347 Mass. 461, 469 (1964) (bill from plaintiff company identified by direct testimony and characteristic stamp of defendant company).[17]

Nardi's best evidence argument is misplaced. "The best evidence rule provides that, where the contents of a document are to be proved, the party must either produce the original or show a sufficient excuse for its nonproduction." *Commonwealth v. Ocasio*, 434 Mass. 1, 6 (2001). The Commonwealth was not attempting to prove the truth of the contents of the check — in fact, it was attempting to do just the opposite: establish that the contents of the check were false, because the check was "signed" by the victim fifteen days after her death. See *Commonwealth v. Lenahan*, 50 Mass. App. Ct. 180, 185-186 (2000) (best evidence objection inapplicable where "obvious that the Commonwealth was not offering the [defendant's writing] to prove the matter of the truth of the contents of the writing"). The admission of the photocopy was proper.

d. *Jury instructions.* Nardi contends that the judge issued an improper instruction on deliberate premeditation. Where a murder defendant, like Nardi, did not object to jury instructions at trial, we review the challenged instructions, pursuant to G. L. c. 278, § 33E, to determine whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth v. Oliveira*, 445 Mass. 837, 842 (2006).

The challenged instruction is set out in the margin, and matches the instruction contained in the Model Jury Instructions on Homicide 8-9 (1999).[18] Nardi argues that the description of deliberate premeditation set forth in *Commonwealth v. Gibson*,

---

[17]Even if there was error, it was not prejudicial given that Nardi also identified the check at trial and testified that he signed his mother's name to the check.

[18]"The third element the Commonwealth must prove beyond a reasonable doubt is that the killing was committed with deliberate premeditation. For the Commonwealth to prove deliberate premeditation, the Commonwealth must prove that the defendant thought before he acted; that is, that the defendant decided to kill after deliberation.

"The element of deliberation, however, does not require an extended time

424 Mass. 242, 247 (1997), specifically "an intent to kill, combined with planning how to effectuate that desire and an evaluation of the 'pros and cons' of proceeding," should have been included in the jury instruction. We have expressly stated otherwise. See *Commonwealth* v. *Roberts*, 433 Mass. 45, 60 n.11 (2000) (instruction that deliberate premeditation requires " 'a critical evaluation of the pros and cons of proceeding with the plan [to kill]' [is] a high standard indeed and a requirement never imposed by our law"). The model instruction given by the trial judge properly "made clear that the jury could convict the defendant of deliberately premeditated murder only if they found that he reflected on the decision to kill before taking action." *Commonwealth* v. *Serino*, 436 Mass. 408, 418 (2002).

3. *Conclusion.* We have examined the record pursuant to G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the murder verdict, regardless of whether such grounds were raised on appeal. We conclude that the evidence supported Nardi's conviction of murder in the first degree, by reason of deliberate premeditation, and that there is no basis on which to reduce that verdict or order a new trial.

*Judgment affirmed.*

---

span, nor does it mean that the deliberation must be accomplished slowly. Rather, it refers to the purposeful character of the premeditation. Deliberation may be a matter of days, hours, or even seconds. It is not so much a matter of time as of logical sequence. First, the deliberation and premeditation, then the decision to kill, and lastly, the killing in furtherance of the decision. All of this may occur within a few seconds.

"However, deliberate premeditation excludes action which is taken so quickly that there is no time to reflect on the action and then decide to do it. The Commonwealth must show that the defendant's resolution to kill was at least for some short period of time the product of reflection."