## COMMONWEALTH *vs.* JOSEPH POPE.

Suffolk. October 2, 1989. - February 8, 1990.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Homicide. Joint Enterprise. Felony-Murder Rule. Robbery. Constitutional Law*, Double jeopardy. *Practice, Criminal*, Instructions to jury, Argument by prosecutor.

At a criminal trial, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that the defendant was guilty of murder in the first degree on the theory that he had entered a joint venture to commit armed robbery and that, during the course of that venture, the victim had been killed by a coventurer. [584-586]

At the retrial of a murder indictment after the jury had been unable to agree on a verdict and a mistrial had been declared, the judge correctly denied the defendant's motion to dismiss the indictment on double jeopardy grounds where the evidence at the first trial was sufficient to support a finding of guilt. [586-587]

At the trial of a murder indictment the prosecutor's remarks in closing argument were fairly inferable from the evidence presented; furthermore, there was no prejudicial error in certain other comments of the prosecutor, considering the argument as a whole and in light of the judge's instructions to the jury. [587-588]

At a murder trial, no substantial likelihood of a miscarriage of justice was created by the judge's instructions to the jury, given at the defendant's request and without objection, regarding the defendant's right to remain silent [588-591]; nor was there any error in the judge's declining to instruct the jury on another issue in the language requested by the defendant [591].

A criminal defendant's arguments on appeal presented no reasons for this court to reconsider the issue of the constitutionality of the felony-murder rule. [591]

INDICTMENTS found and returned in the Superior Court Department on August 15, 1984.

The cases were tried before *Walter E. Steele*, J.

*David Duncan* for the defendant.

*Susan Underwood*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant appeals from his convictions of armed robbery and murder in the first degree. The defendant alleges error in (1) the denial of his motion for a required finding of not guilty as to the indictment charging murder; (2) the denial of his motion to dismiss on the ground of double jeopardy prior to the commencement of his second trial;[1] (3) the prosecutor's closing argument; and (4) the judge's instructions to the jury. He also claims the felony-murder rule is unconstitutional. He further requests that this court exercise its power under G. L. c. 278, § 33E (1988 ed.), and grant him a new trial or in the alternative reduce the degree of guilt. We affirm his convictions.

We summarize the relevant facts in a light most favorable to the Commonwealth. See *Commonwealth* v. *Clary*, 388 Mass. 583, 588 (1983). The principal witness for the Commonwealth was Bienvenido DeJesus (DeJesus), the brother of the murder victim. In May, 1984, DeJesus lived in the Dorchester section of Boston with his wife, his two children, and his brother. DeJesus worked for the Department of Public Welfare as an assistant financial technician, and he came to know the defendant, who was a security guard at the welfare office. At that time, the defendant went by the name "Louis Jackson." DeJesus introduced the defendant to his brother so that the defendant could purchase cocaine from him.

On the evening of May 23, 1984, DeJesus was at home with various members of his family who were visiting him. At approximately 10 P.M., most of the visitors left, leaving DeJesus, his two children, and his brother in the house. DeJesus walked to a nearby liquor store, where he made some purchases. He pocketed the change of approximately $15 and headed back to his house. On the way, he noticed a

---

[1]The defendant's first trial ended in a mistrial. Floyd Hamilton was a codefendant at the first trial. Prior to the second trial their cases were severed.

gray van parked near his house on the opposite side of the street. He observed the defendant emerge from the van and cross the street. The defendant asked DeJesus if his brother was home. DeJesus said that he was. DeJesus entered the house, went upstairs, and told his brother that the defendant was downstairs asking for him. DeJesus's brother went downstairs.

DeJesus entered the upstairs bathroom. Within a few minutes, DeJesus noticed his brother, the defendant, and a third person, later identified as Floyd Hamilton, walk by the bathroom door in the direction of his brother's bedroom. DeJesus had never seen Hamilton before this moment. A couple of minutes later, DeJesus saw the same three persons walk past the bathroom in the opposite direction, toward the room where his brother did "whatever he had to do with cocaine."

DeJesus heard some people going downstairs. Within seconds, DeJesus heard his brother say from the downstairs area of the house, "Oh, no, not this. You'll have to shoot." DeJesus heard stumbling, a scuffle, and, immediately afterward, a shot. DeJesus then heard his brother cry out, "Compi," a name which the brothers were accustomed to calling each other. DeJesus walked to the bathroom door. He stopped when a handgun was put to his forehead. At the other end of the gun was the defendant.

The defendant pulled DeJesus into the room where his brother's drug transactions took place, keeping the gun at DeJesus's forehead. Inside the room, the defendant backed away a couple of steps but continued to aim the handgun at DeJesus. The defendant said, "Give me everything you got." DeJesus took the change he had received at the liquor store out of his pocket and threw it on a table, where some cocaine lay.

At this point, DeJesus saw Floyd Hamilton running up the stairs. Hamilton was carrying a shotgun. He knelt down and pointed the shotgun at DeJesus. Hamilton said, "Jackson, let's go." The defendant scooped up the money and cocaine from the table. DeJesus told them to take everything and get

out before the police arrived. Hamilton and the defendant left.

DeJesus went downstairs. He saw his brother at the bottom of the stairs, lying in a pool of blood, with a shotgun wound in his chest. According to the medical examiner, the victim died immediately after being shot in the heart and left lung. Approximately one week following the shooting, the police recovered the shotgun which had caused the victim's death in the possession of one Ricardo Tisdale.

The defendant did not testify.

1. *Motion for a required finding of not guilty.* The defendant argues that the trial judge erred in refusing to grant his motion for a required finding of not guilty at the close of the Commonwealth's case. The Commonwealth tried the case on the theory that the defendant had entered a joint venture to commit armed robbery, and that, during the course of that venture the victim had been killed by a coventurer. We hold that there was sufficient evidence for the jury to conclude, beyond a reasonable doubt, that the defendant was guilty of murder in the first degree under a theory of joint venture felony-murder.

"The essential question in evaluating the denial of a motion for a required finding of not guilty is whether the evidence received, viewed in a light most favorable to the Commonwealth, is sufficient so that the jury 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt.' " *Commonwealth* v. *Clary, supra,* quoting *Commonwealth* v. *Vellucci,* 284 Mass. 443, 445 (1933).

Under the felony-murder rule, "a homicide committed during the commission or attempted commission of a felony is murder." *Commonwealth* v. *Silva,* 388 Mass. 495, 503 (1983). "Once it is determined that a defendant is a joint venturer in a felony and that a homicide occurred in the commission or attempted commission of that felony, complicity in the underlying felony is sufficient to establish guilt of

murder in the first or second degree (see G. L. c. 265, § 1) if the homicide followed naturally and probably from the carrying out of the joint enterprise." *Commonwealth* v. *Ambers*, 370 Mass. 835, 839 (1976). There must be evidence that the defendant intentionally assisted Hamilton in the commission or attempted commission of the crime of armed robbery, sharing with Hamilton the mental state required for that crime. *Commonwealth* v. *Watson*, 388 Mass. 536, 544-545 n.7 (1983), *S.C.*, 393 Mass. 297 (1984). "[O]ne who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal. . . . The jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Williams*, 399 Mass. 60, 69-70 (1987), quoting *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979).

The jury could conclude from the evidence before it that the defendant and Hamilton were engaged in a joint venture to rob DeJesus and his brother. The defendant and Hamilton entered the house together. Hamilton went downstairs with the victim. The defendant stayed upstairs near DeJesus. There was evidence that Hamilton and the defendant each was armed. The jury could infer that Hamilton attempted to rob the victim, because the victim exclaimed, "Oh, no, not this. You'll have to shoot." The defendant proceeded to rob DeJesus at gunpoint, after the shotgun had already been fired downstairs. The jury could infer that, in so doing, the defendant was carrying out a prearranged plan. Joint venture could further be inferred from the fact that, as the defendant was robbing the victim, Hamilton ran upstairs and said, "Jackson, let's go," and the defendant fled with Hamilton. See *Commonwealth* v. *Giang*, 402 Mass. 604, 608 (1988), and cases cited.

The defendant argues that the Commonwealth did not show that the defendant knew that Hamilton had a gun. In *Commonwealth* v. *Fickett*, 403 Mass. 194, 197 (1988), and *Commonwealth* v. *Watson*, 388 Mass. 536, 544 (1983), we

held that it was essential for a finding of guilt of murder in the course of the commission of armed robbery that the defendant knew that the killer had a gun, and it was held in those cases that the evidence did not warrant such a finding. "When, as here, knowledge is an essential element of an offence, it may be, and generally is, proved by circumstantial evidence; and it may be inferred from a great variety of circumstances." *Commonwealth* v. *Barry*, 397 Mass. 718, 722 (1986), quoting *Commonwealth* v. *Altenhaus*, 317 Mass. 270, 273 (1944). Unlike *Fickett* and *Watson*, in this case the defendant himself was armed with a gun which he used to commit the armed robbery of DeJesus. The jury could infer from this fact, combined with the other facts relating to the events in the house, that the defendant knew that Hamilton was armed. The fact that the defendant robbed DeJesus after the victim was shot does not compel a finding that the robbery was a separate and unrelated criminal act. There was sufficient evidence for the jury to infer that the robbery of DeJesus was part of a preconceived scheme. "The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable . . . . To the extent that conflicting inferences are possible from the evidence, 'it is for the [finder of fact] to determine where the truth lies.' " *Commonwealth* v. *Giang*, *supra* at 609, quoting *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988).

2. *Double jeopardy.* The defendant's first trial ended in a mistrial because the jury were unable to agree on their verdicts. The defendant claims that the trial judge erred in denying his motion to dismiss the murder indictment on double jeopardy grounds. But "[a] deadlocked jury . . . does not result in an acquittal barring retrial under the Double Jeopardy Clause." *Tibbs* v. *Florida*, 457 U.S. 31, 42 (1982). See *Berry* v. *Commonwealth*, 393 Mass. 793, 794 (1985). The defendant nevertheless claims that the evidence at the first trial was insufficient to support a guilty verdict. The evidence presented at that trial did not differ materially from the evidence presented to the jury at this trial. For the reasons stated in the previous section, the evidence was sufficient to

support a finding of guilt. Therefore, the judge was correct in denying the defendant's motion. Cf. *Burks* v. *United States*, 437 U.S. 1, 18 (1978).

3. *The prosecutor's closing argument.* The prosecutor, in his closing argument, suggested a hypothetical conversation that might have taken place between the defendant and Hamilton concerning the armed robbery scheme.[2] Prosecutors should use caution in speculating as to what conversations might have occurred, and should refrain from presenting hypothetical conversations not fairly inferable from the evidence before the jury. See *Commonwealth* v. *O'Brien*, 377 Mass. 772, 778-779 (1979); *Commonwealth* v. *McColl*, 375 Mass. 316, 324 (1978). The prosecutor should tailor his comments so that they remain "properly grounded in the evidence." *Commonwealth* v. *Corriveau*, 396 Mass. 319, 337 (1985). Nevertheless, there are occasions when "counsel may present an argument by dramatizing it in imaginary dialogue or illustrating it by imaginary occasions," *Commonwealth* v. *Clary*, 388 Mass. 583, 590 (1983), such as in this case where the prosecutor's remarks were fairly inferable from the evidence presented. There was no reversible error.

We also think that there was no prejudicial error in the prosecutor's remark regarding defense counsel's failure to ask police officers at trial whether they had recorded conversations of any of the people in the house.[3] The prosecutor's

---

[2] The prosecutor said: "How did Joe Pope decide to get in there? Well, he knew [the victim], bought drugs there before. He could get in, a necessary element to this armed robbery. Joseph Pope says, 'We need somebody' — if you were in the company of Joseph Pope that night — 'who can get us in, because we are not going to knock down a steel door without causing a big ruckus.' . . . Then some ruse was used to go out and get the guns: 'Got to get my money — left it in the van'; 'Got to go outside now and make sure the van's not double-parked.' Any number of things could have been said. There was no evidence to what exactly the ruse was, but there was evidence that at least two people went downstairs. And then there is evidence of armament: 'We had no armament, now we have armament.'"

[3] The prosecutor stated: "[The detective] took no notes. Nobody did. I think that is true. Did he ask the officers, 'Are there any other reports?' Did he ask the officers — the other officers? Did he ask [one of the investi-

comment responded to defense counsel's reference in his closing to the fact that the police took no notes of statements made by DeJesus at the time of the incident.

"In analyzing a claim of improper argument, the prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984), quoting *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 885 (1984). Even if the prosecutor's remarks could be viewed as suggesting that there in fact existed recordings supporting DeJesus's story, which we consider unlikely, the prosecutor's admonition to the jury to judge the defendant based only on the evidence before them, as well as the judge's cautionary instruction that closing arguments are not evidence, removed any possibility of prejudice. The jury are presumed to follow the judge's instruction. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 (1986); *Commonwealth* v. *Cameron*, 385 Mass. 660, 668 (1982).

4. *Jury Instructions.*

a. The defendant argues that the judge's instructions to the jury regarding his right to remain silent violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution[4] and art. 12 of the Massachusetts Declaration of Rights.[5] The charge given was as requested by the defendant and without objection.[6] We hold that, in

---

gating officers]? Did [that officer] make reports? Did he ask [the detective]? And he recalled [the detective] so he had two opportunities. Whether or not — besides writing anything down — whether or not [the detective] taped conversations of any of these people? No. Why is that? Could he have? Sure."

[4]The Fifth Amendment provides, in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself."

[5]Article 12 provides, in relevant part: "No subject shall . . . be compelled to accuse, or furnish evidence against himself."

[6]We thus apply the substantial likelihood of a miscarriage of justice standard under G. L. c. 278, § 33E. See *Commonwealth* v. *Griffith*, 404 Mass. 256, 260 n.4 (1989).

the circumstances of this case, the judge's instructions did not create a substantial likelihood of a miscarriage of justice.

Regarding the defendant's right to remain silent, the judge charged as follows:

> "The defendant has asked me to say to you in his own words, and I am going to do it: The law is that if you accuse him, then you prove it. And you prove it beyond a reasonable doubt, and he need not — he need say nothing. You probably noticed that the defendant did not testify. You cannot use this against him. *No unfair inference can be drawn from the fact that he did not testify.* Do you understand that?" (Emphasis supplied.)

The emphasized words were given in accordance with the defendant's request. He now claims this language created a substantial likelihood of a miscarriage of justice. We do not agree.

"The law in this Commonwealth has long been that art. 12 prohibits any comment by the judge which can be fairly understood as permitting the jury to draw an inference adverse to the defendant from the fact of his failure to testify. *Brown* v. *Commonwealth*, 335 Mass. 476, 481-482 (1957). *Opinion of the Justices*, 300 Mass. 620 (1938). *Commonwealth* v. *Maloney*, 113 Mass. 211, 214 (1873)." *Commonwealth* v. *Goulet*, 374 Mass. 404, 412 (1978).

In assessing the defendant's claim, we "view the charge in its entirety since the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Murray*, 396 Mass. 702, 705 (1986), quoting *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). See *Commonwealth* v. *Albert*, 391 Mass. 853, 857-858 (1984). Throughout his charge, the judge repeatedly emphasized the defendant's presumption of innocence and correctly instructed the jury that the Commonwealth had the burden of proving each element of the crime beyond a reasonable doubt. For example, the judge stated that "the defendant is

presumed innocent, and in addition to that, he does not have to disprove his guilt. He does not have to establish his innocence."[7] The judge, in the midst of the charge at issue, also stated, in the defendant's words: "The law is that if you accuse him, then prove it. And you prove it beyond a reasonable doubt and . . . he need say nothing. You probably noticed that the defendant did not testify. You cannot use this against him." The judge's charge, viewed as a whole, informed the jury that they could not draw adverse inferences against the defendant from the fact that he did not testify. In light of the instruction quoted above, we think that it is unlikely that the jury interpreted the phrase "unfair inference" to mean that the defendant's silence could be used against him. While the phrase may have been a poor choice of words (chosen by the defendant), we do not consider its use to have created a substantial likelihood of a miscarriage of justice.

We reach the same conclusion with respect to the judge's statement that the defendant had asked him to instruct the jury on the right to remain silent. By telling the jury that the defendant had requested the instruction, the judge did not belittle the defendant's rights or disassociate himself from the defendant. Cf. *Commonwealth* v. *Sneed*, 376 Mass. 867, 872 (1978). Rather, most likely in the jury's view, the judge was placing his imprimatur on the defendant's request, imbu-

---

[7]Other instructions on the presumption of innocence include the following: "The defendant, as I said earlier at the commencement of the trial, is presumed to be innocent. Let me repeat that: The defendant is presumed to be innocent. And this presumption of innocence is a rule of law which compels you to find the defendant not guilty in the absence of evidence that convinces you as reasonable individuals that the defendant is guilty beyond a reasonable doubt. The presumption of innocence lasts in a trial unless and until such time as the Commonwealth offers evidence that convinces you that the defendant is guilty of the offenses beyond a reasonable doubt. . . . The burden of proof is upon the District Attorney; and every person, of course, is presumed to be innocent until he is proved guilty. And if, after consideration of all the evidence, there is remaining a doubt, the accused must be acquitted."

ing it with the authority of the court. There was no substantial likelihood of a miscarriage of justice.[8]

b. The defendant requested instructions regarding equally balanced evidence, culled from language appearing in *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965), and *Commonwealth* v. *Curtis*, 318 Mass. 584, 585 (1945). The judge acted within his discretion in declining to charge the jury with the language requested by the defendant. See *Commonwealth* v. *Freiberg*, 405 Mass. 282, 303 (1989); *Commonwealth* v. *Monico*, 396 Mass. 793, 806 (1986).

5. *Felony-murder.* The defendant challenges the constitutionality of the felony-murder rule, claiming that the rule constitutes a violation of the due process clause of the Fourteenth Amendment to the United States Constitution and of art. 12 of the Massachusetts Declaration of Rights. We have repeatedly rejected this argument. See *Commonwealth* v. *Hawkesworth*, 405 Mass. 664, 675 (1989); *Commonwealth* v. *White*, 392 Mass. 282, 287-288 (1984); *Commonwealth* v. *Moran*, 387 Mass. 644, 647-650 (1982); *Commonwealth* v. *Watkins*, 375 Mass. 472, 485-488 (1978). The defendant has not offered us any new lines of attack which might persuade us to abandon our prior decisions.

6. *G. L. c. 278, § 33E.* After a review of the entire record, we decline to exercise our authority to order a new trial or to reduce the verdict under G. L. c. 278, § 33E.

*Judgments affirmed.*

---

[8]We reject the defendant's claim that his trial counsel was ineffective. We do not consider experienced trial counsel's submission of the defendant's requested instructions or his decision not to object to the judge's prefatory remarks conduct which fell "measurably below that which might be expected from an ordinarily fallible lawyer." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).