## COMMONWEALTH vs. KENNETH TAYLOR.

Plymouth. September 11, 2009. - November 23, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, BOTSFORD, & GANTS, JJ.

*Homicide. Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Capital case, Confrontation of witnesses, Argument by prosecutor, Instructions to jury. *Evidence,* Expert opinion, Medical report, Cross-examination, Bias. *Witness,* Cross-examination, Bias.

At a murder trial, no error arose from allowing a pathologist who did not perform the autopsy to express his own opinion at trial as to the cause of death, based on his review of an autopsy report prepared by another pathologist (who had performed the autopsy but had retired before trial), where the defendant had the opportunity to question the foundation of the testifying pathologist's opinion on cross-examination [376-377]; further, the admission of details in the autopsy report during the direct examination of the testifying pathologist, although error, did not create a substantial likelihood of a miscarriage of justice, where the details were consistent with the defense [377-378]; finally, where the cause of death was not (and reasonably could not have been) a contested issue at trial, there was no merit to the defendant's claim, raised for the first time on appeal, that uncertainty as to which pathologist's opinion the jury accepted warranted a new trial [378].

At a murder trial, the judge did not abuse her discretion in limiting the defendant's cross-examination concerning the possible specific bias of a key Commonwealth witness, where inquiry into bias had been extensively aired in general, and where the defendant failed to make a plausible showing of the basis on which his assertion of specific bias lay. [378-381]

At a murder trial, certain remarks in the prosecutor's closing argument that misstated one witness's testimony did not create a substantial risk of a miscarriage of justice, where the defense did not object to the remarks; where the remarks, although going to a critical issue in the case, were mitigated by the judge's instructions to the jury; and where, in the circumstances (including the brevity of the trial and the jury's fresh memory of the testimony), the remarks could not have made a difference in the jury's conclusions. [381-385]

At a murder trial in which the defendant's presence at the scene of the crime and his possession of a firearm were the heart of the Commonwealth's case, the judge's instructions to the jury, in which she used the example of an application for a gun license to explain why police might, for neutral reasons, have a defendant's photograph that was used in an array, did not create a substantial likelihood of a miscarriage of justice, where it was unlikely that those instructions caused the jury to draw an inference adverse to the defendant. [385-387]

INDICTMENTS found and returned in the Superior Court Department on September 22, 2000.

Following review by this court, 447 Mass. 49 (2006), the cases were tried before *Linda E. Giles*, J.

*Aziz Safar* for the defendant.

*John E. Bradley*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of deliberately premeditated murder and armed home invasion. On appeal, he alleges constitutional error in (1) the admission of portions of the report of a forensic pathologist who was not available for cross-examination and (2) the denial of cross-examination of a key Commonwealth witness on a matter of bias. He further alleges error in (3) the prosecutor's closing argument, which misstated important evidence, and (4) the judge's use of the example of an application for a gun license to explain why police might, for neutral reasons, have a defendant's photograph that was used in an array, where the defendant's presence at the scene and possession of a gun were the heart of the Commonwealth's case. The defendant also urges us to grant him a new trial pursuant to our powers under G. L. c. 278, § 33E. We affirm and decline to exercise our power under G. L. c. 278, § 33E.

1. *Background.* The defendant's first trial ended in a mistrial after the jury were unable to reach a unanimous verdict. The defendant then moved, on principles of double jeopardy, to preclude the Commonwealth from proceeding on a theory of joint venture. He was denied relief by the trial court, by a single justice in the county court, and by this court. See *Taylor* v. *Commonwealth*, 447 Mass. 49 (2006). We summarize the evidence at his retrial on which the jury could have convicted him.

Joseph Cooper, a codefendant in this case, testified against the defendant in exchange for the prosecutor's promise of a recommendation of a sentence of from eight years to eight years and one day to the State prison on a guilty plea to so much of the indictment against him as alleged manslaughter.[1] Cooper testified that he went to Brockton on October 24, 1999, to visit his cousin, Antwan Burton, also a codefendant.[2] At

---

[1] Cooper did not testify at the defendant's first trial.

[2] Burton was tried separately, and his conviction of murder in the first

approximately 3 P.M., he and Burton went to visit Natasha Nelson, who also lived in Brockton and who both men knew from the "alternative-type" school they attended. Cooper asked Nelson if she wanted some "weed." She said she knew some people who had a lot of drugs and whom they could rob. She asked Cooper if he was interested. He said he would think about it.

Cooper and Burton left. They went to a house in Brockton where the defendant lived. Other people were there, and Burton introduced Cooper to them as his cousin. They all discussed the robbery that Nelson had proposed, and four of them — Burton, Cooper, the defendant, and a fourth unnamed male — agreed to carry out a plan they devised. The four men wore dark clothing, hooded sweatshirts, and masks.[3] The defendant had a nine millimeter handgun. They agreed to take two vehicles.

The fourth male rode in a red Dodge Caravan van with a woman who also participated in the discussion to rob. Burton and Cooper rode in Burton's grey Nissan Maxima automobile, which was driven by a male who did not participate in the discussion to rob. They all proceeded to Nelson's home to pick her up so she could show them the house where the robbery was to take place. Nelson sat in the back seat of the Maxima, between Cooper and the defendant. She had never seen the defendant before that time. She gave the driver of the Maxima directions to 216 Court Street in Brockton.

The two cars were parked on Peckham Avenue, near its intersection with Court Street. The four men got out of the vehicles and walked up the back stairs of a three-story, three-apartment house at 216 Court Street, which abutted the side of Peckham

degree was reduced on appeal to murder in the second degree. See *Commonwealth* v. *Burton*, 450 Mass. 55, 65 (2007).

[3]There was disagreement among the witnesses as to the masks. Cooper testified they all wore "Jason-type" plastic masks with white faces. Charles Rich, the third-floor tenant in the apartment house where the victim lived, said that on his way downstairs he bumped into one of the assailants, who wore a white mask like that used in the movie "Scream"; it was not clear from his testimony whether the others wore similar masks. The person he bumped into had a gun. Michael Seltzer, one of the victim's roommates, saw four people running out of the apartment house after the shooting. At the time, two were wearing masks. One wore a dark knit mask, and one wore a white plastic "Scream" mask. The one with the "Scream" mask was one of the first to emerge from the house. The third or fourth one out had a gun.

Avenue across from where they parked. The time was approximately 9 P.M. The defendant was the first to enter the house, followed by Cooper, Burton, and then the fourth male.

The victim was one of three tenants of the second-floor apartment and was the only occupant of the apartment when Cooper knocked on the door. He opened the door, saw the masks, and slammed the door shut. All four assailants "rushed the door," and it "popped open." The victim ran into the living room, followed by the defendant. The defendant fired his gun four or five times. The four men then ran out of the apartment and down the back stairs. They ran to the two vehicles.

Charles Rich, the third-floor tenant of the apartment house, was walking down those same stairs just after the shots were fired. He bumped into one of the assailants, who he inferred was male because the person's body felt "hard." The assailant was wearing a "Scream" mask, and he had a gun in his right hand. Rich quickly returned to his apartment.

Michael Seltzer, one of the victim's roommates, was returning to the apartment when he heard the shots while going up the stairs. He ran back outside and stood behind a car. He saw four people dressed in dark clothing leaving the house. The third or fourth one out had a gun that discharged as the figure was running down the driveway. The gun was pointing downward at the time. Seltzer later showed police where the gun discharged in the driveway. He described the man with the gun as five feet, ten inches tall, with a medium build. Cooper testified that at the time he was six feet tall and weighed about 240 pounds; Burton was six feet tall and weighed about 180 pounds, being of medium build; and the defendant was about five feet, eight inches tall, and thin. Little is known about the fourth man.

Dennis Sheppard had returned his children, after visitation, to his former wife, who lived nearby on Peckham Avenue. He had seen the four figures emerge from two parked vehicles, and he saw the four figures return to the vehicles, which then were driven away, all within a span of about ten minutes.

The two vehicles went in different directions, and no further evidence was presented about the red Caravan or its occupants. The Maxima was driven to Burton's home. On the way the defendant said, "[I] hope nobody got no mouth." Cooper asked the

defendant why he had shot the victim. The defendant said something about a telephone and tucked the gun under his waistband. After they arrived at Burton's home, Cooper again asked the defendant why he did it. The defendant said that the victim was going for the telephone and that he did not know whether the victim would contact the police. The defendant left Burton's house. A short time later, the driver, Cooper, and Nelson left Burton's house together.

In the meantime, after he determined it was safe, Charles Rich went back downstairs. He entered the victim's apartment and found him lying facedown in the living room. He rolled the victim onto his back, exposing a telephone. He applied pressure to a chest wound until paramedics arrived. The victim was pronounced dead that evening at a local hospital. The cause of death was determined to be a gunshot wound to the heart. The victim sustained a total of three gunshot wounds.

A State police ballistics expert recovered three nine millimeter discharged cartridge casings from the victim's living room and opined that they were fired from the same weapon. He attended the autopsy and received four spent projectiles or portions of projectiles from the pathologist as they were removed from the victim's body. Two of those projectiles and a fifth, recovered by a State trooper from the couch in the victim's living room, were fired from the same weapon, but it could not be determined whether that was the same weapon that ejected the spent shell casings. The State trooper also recovered a spent projectile from the driveway.

2. *Denial of confrontation.* The defendant argues that he was denied his rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights to confront and cross-examine a pathologist who did not testify at trial but whose autopsy report was quoted by a pathologist who did testify at trial. The first pathologist performed the autopsy but had retired before trial. The pathologist who testified at trial reviewed the medical examiner's file, including the toxicology report, the autopsy report, and the autopsy photographs. He expressed his own opinion as to the cause of death, based on his review of the aforesaid materials and his own education, training, and experience, opining that the victim died of a gunshot wound to the heart. His opinion was more specific than

that of the original pathologist, who opined that death was caused by the three gunshot wounds. The testifying pathologist opined that the other wounds were potentially treatable if the victim had arrived at the hospital within a few hours. There was no objection to the testimony, so we review to determine if any error caused a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Nardi*, 452 Mass. 379, 394 (2008); *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

In *Commonwealth* v. *Nardi*, *supra* at 387-391, we held, in circumstances virtually identical to those here, that there was no error in allowing a pathologist who did not perform the autopsy to express his own opinion at trial as to the cause of death, based on his review of the autopsy report and photographs, and on his education, training, and experience in the field of pathology. Because the defendant in that case had the opportunity to question the foundation of the witness's opinion on cross-examination, we held that his right of confrontation was not violated as to the testifying expert's opinion. In those respects this case is indistinguishable. There was no error.

The defendant next asserts error in the admission of details of the autopsy report during the direct examination of the testifying pathologist. We agree that the testimony was inadmissible hearsay, and the statements in the autopsy report were testimonial in the constitutional sense. *Commonwealth* v. *Nardi*, *supra* at 391-394. Because there was no objection we must determine whether the error created a substantial likelihood of a miscarriage of justice. In doing so we will look to the trial as a whole. *Id.* at 394.

In *Commonwealth* v. *Nardi*, *supra*, the crux of the defense was whether the victim was murdered or died of natural causes. *Id.* at 383. While the opinion as to cause of death in that case was important to the Commonwealth and was properly admitted, the details of the autopsy report, in contrast, were important to the defense. Although erroneously admitted during the direct testimony of the Commonwealth's pathologist, they were utilized and relied on by the defense pathologist. We held that in those circumstances the details of the autopsy report were consistent with the defense, and therefore their erroneous admission did not create a substantial likelihood of a miscarriage of justice. *Id.* at 395-396.

In the instant case there was absolutely no dispute that the

victim was murdered. The crux of the defense in this case was that the testimony of Nelson and Cooper implicating the defendant as one of the four assailants who burst through the door with the intent to rob the victim was not credible, and that there was no physical or forensic evidence linking the defendant to the murder. Defense counsel attacked the credibility of both Nelson and Cooper, eliciting evidence of their bias in favor of the Commonwealth, and he elicited statements from the two State police troopers who testified, as well as the pathologist, that there was no physical or forensic evidence linking the defendant to the murder. In this regard, the details of the autopsy report were important to the defense because they contained no evidence linking him to the crime, a point he argued forcefully to the jury. As in the *Nardi* case, the admission of the testimony of the autopsy report, although erroneous, was consistent with the defense and did not create a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Nardi, supra* at 395-396.

The defendant's final claim on this matter is that there is no way of knowing whether the jury accepted the opinion of the pathologist who testified or the opinion of the pathologist who performed the autopsy, and that therefore the question must be resolved in his favor. The defendant raises this issue for the first time on appeal. For the reasons just discussed, the cause of death was not a contested issue at trial, and we are highly doubtful that it reasonably could have been. We are confident there was no substantial likelihood of a miscarriage of justice.

3. *Cross-examination of Joseph Cooper.* The defendant argues that he was denied his rights under the Sixth Amendment and art. 12 to confront and cross-examine Cooper on a matter of bias, namely, that Cooper chose not to testify at Burton's trial. His claim of error arises from the following exchange at trial:

| DEFENSE COUNSEL: | "Now, you're testifying in this trial of Kenneth Taylor in exchange for a plea bargain, if you will, is that right?" |
|---|---|
| THE WITNESS: | "Correct." |
| DEFENSE COUNSEL: | "Did you testify in the trial of your cousin, Burton?" |

THE FIRST PROSECUTOR:     "Objection, Your Honor."

THE JUDGE:                "Sustained."

DEFENSE COUNSEL:          "May I be heard, Judge?"

THE JUDGE:                "Sure."

The discussion continued at a bench conference:

DEFENSE COUNSEL:          "Judge, I suggest that his answer to that question would indicate certainly a bias towards this defendant as opposed to Burton, in other words, selective. I think it's certainly relevant."

THE FIRST PROSECUTOR:     "I disagree. Certainly he could have. Certainly at both. We don't even know if he was available. I don't see the connection he's trying to make as far as bias. I don't think it's proper for any bias."

THE SECOND PROSECUTOR:    "Not only that, Your Honor, he was charged with murder. It wasn't part of his agreement, the agreement he entered into with the Commonwealth to testify against Taylor."

THE JUDGE:                "There['s] a collision here with reference to some of these . . . Fifth Amendment problems, which is one issue here. He wasn't provided with a cooperation agreement in Mr. Burton's case. Therefore, he had a valid Fifth Amendment privilege not to testify. However, that could lie as possible bias evidence that he didn't enter into a cooperation agreement.

"The trouble . . . that I have is that it takes two to make an agreement. And I don't know what part

the Commonwealth played in that. What if the Commonwealth is playing hard ball and didn't want to give him a cooperation agreement? That wouldn't show bias on this witness's part. If it's just up to this witness, whether or not he could elect to testify, it could perhaps give you evidence of bias.

"But the cooperation agreement takes, as I say, two to tango. And let's say for argument sake the Commonwealth was hard nosed about it. Then that eviscerates any bias argument. So I'm going to sustain the objection."[4]

DEFENSE COUNSEL:          "Note my objection."

THE JUDGE:                "Noted."

The right of a criminal defendant to cross-examine a prosecution witness to show bias is guaranteed by the Sixth Amendment and art. 12. *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 400 (1995), and cases cited. A judge has discretion to limit cross-examination concerning possible specific bias where inquiry into bias has been "sufficiently aired" in general. *Commonwealth* v. *LaVelle*, 414 Mass. 146, 154 (1993), quoting *Commonwealth* v. *Hicks*, 377 Mass. 1, 8 (1979). A defendant who seeks to pursue a subject in an attempt to show a witness's bias must make a plausible showing of the basis on which his assertion lies. *Commonwealth* v. *Tam Bui*, *supra* at 401; *Commonwealth* v. *LaVelle*, *supra* at 153. Whether the anticipated evidence demonstrates bias is a matter within the discretion of the trial judge. *Id.* "While a trial judge has discretion in this matter, he or she has no discretion to prohibit all inquiry into the subject" of bias. *Commonwealth* v. *Aguiar*, 400 Mass. 508, 513 (1987).

[4]The judge also presided over Taylor's first trial and Burton's trial. *Commonwealth* v. *Burton*, 450 Mass. 55 (2007). She appears, however, to have made factual assumptions without any evidentiary proffer by either prosecutor about the Commonwealth's position in its dealings with Cooper.

Defense counsel extensively explored the matter of Cooper's bias during his cross-examination. He made much of the plea agreement, including the fact that Cooper expected to be a free man in slightly more than two years after he received credit for the time he had been incarcerated since his arrest. He also repeatedly stressed, no less than nineteen times, the fact that Burton was Cooper's cousin. At one point he elicited from Cooper a response that suggested, as his cousin, Burton was more than a friend to Cooper.

Generally, witnesses do not choose to testify; they are obligated to do so when called by a party. Nevertheless, the questions whether — and, if not, why — Cooper testified at Burton's trial might reveal bias. The answer to those questions, as the judge noted, was not contained in any proffer by the defendant. Cooper's cooperation agreement (or the plea agreement, as it is variously described), is not contained in the record, and we do not know its terms or when it was executed. Nor does the record reveal if Cooper negotiated a provision that he not be called to testify at Burton's trial, which would be evidence of bias, also noted by the judge. In addition, the record does not indicate if the Commonwealth simply decided it had no need to secure Cooper's testimony at Burton's trial or at Taylor's first trial. Without a showing as to the role the prosecutor played in Cooper's agreement, there is no way to ascertain from the record whether the answer to defense counsel's question would have revealed bias.

Based on the record we conclude that the judge did not abuse her discretion in foreclosing the inquiry. See *Commonwealth* v. *LaVelle*, *supra* at 153.

4. *Prosecutor's closing.* The defendant argues that the prosecutor misstated evidence in his closing argument that had the effect of bolstering the shaky credibility of Nelson and Cooper, the Commonwealth's key witnesses, while discrediting the defense theory that Cooper was the shooter. The Commonwealth concedes that the prosecutor misstated the evidence. Because there was no objection, we review to determine whether the prosecutor's misstatement created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

The portion of the prosecutor's closing containing the misstate-

ment occurred in his discussion of the testimony of Charles Rich, at the point where Rich bumped into one of the assailants:[5]

"Think about the testimony of Charles Rich. Charles Rich was the guy that lived up on the third floor. He came down when he first heard the noise. Charles Rich tells you that he literally bumps into a guy with a mask, described as a white Scream type mask, holding a gun.

"Now, ladies and gentleman, it's your memory of the witness's testimony that controls here. But I suggest to you that when Charles Rich testified, he described that person as being about his size. Now, do you remember what he looked like? Well, I suggest he is about five-eight, five-nine, and slightly built.

"Now, we all remember what Joseph Cooper looked like. Joseph Cooper was built like a Coke machine with a head. He's about six feet tall, 260 pounds. And those are his words.

"Wouldn't it make sense that if Charles Rich bumped into a guy like that he'd either be knocked backwards or he'd tell you that he bumped into this big, huge, stocky guy.

"But that's not what Charles Rich described. He described a guy that was about his size. And I suggest to you, ladies and gentlemen, that Kenny Taylor, the defendant, was about Charles Rich's size. Think about that when you think about the credibility of Joseph Cooper and Natasha Nelson."

When asked to describe the assailant he bumped into on the way down the stairs, Rich actually testified:

---

[5]For his part, defense counsel recounted Rich's testimony in his closing:

"And I want you to remember the testimony of Chuck Rich. He lived upstairs. Heard the commotion. He came downstairs, he said, at a high rate of speed. And you saw those stairs, how they wind down. And he bumped into somebody big, a male, that had a mask on. Actually came in contact with him and described him as a big man. Not slightly built Kenneth Taylor. And that big man had the gun. And I suggest to you that you can infer, in other words, logically deduce, that the man who came out of there last with the gun in his hand was Joseph Cooper. And Joseph Cooper is going to be on the streets of Brockton in a little over two years."

Q.: "Can you describe that person you bumped into for us, please?"

A.: "Yes. They were dressed all in black. I looked up and they had a mask from the movie Scream on."

Q.: "I'm sorry?"

A.: "I'm sorry. They had a mask from the movie Scream on them with a hood and they were wearing all black."

Q.: "Where was that person standing?"

A.: "Right at the doorway."

Q.: "Of the second floor?"

A.: "Correct."

Q.: "Could you tell whether it was a male or female?"

A.: "When I bumped into them, it was a hard body. So, I mean, just at physical touch, it felt like a male."

Q.: "So you literally bumped into this person?"

A.: "Correct."

Q.: "You described this mask as being from the movie Scream. Could you tell us what it looked like?".

A.: "Kind of like a scary ghost mask, white, with a black hood to it. And I've seen it many times."

Q.: "Could you see any of this person's skin?"

A.: "Not at the time, no."

Rich went on to say that this person had "what appeared to be a gun in his right hand."

A prosecutor may argue "forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence." *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). "When a defendant raises a claim of error regarding a prosecutor's closing argument, we consider (1) whether the

defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions." *Commonwealth* v. *Kater*, 432 Mass. 404, 422-423 (2000), citing *Commonwealth* v. *Kozec, supra* at 518. The first three factors actually become subsumed into the fourth. "[T]he entire record, including the balance of the prosecutor's argument, [is] relevant in determining whether the error was prejudicial to the point of requiring a reversal of the conviction." *Commonwealth* v. *Kozec, supra* at 523. Although defense counsel also misstated Rich's testimony (the lawyers appear to have supplied personal identifying features to the gunman that they had hoped Rich would provide to support their respective cases, but that Rich was utterly unable to do), "prosecutors are held to a stricter standard of conduct than are errant defense counsel and their clients." *Commonwealth* v. *Kozec, supra* at 519. Moreover, errors in defense counsel's closing argument generally do not act as a counterweight to the prosecutor's argument and "probably will have no bearing either in defining the proper limits of the prosecutor's argument or in assessing the defendant's chances on an appeal challenging the prosecutor's closing argument." *Id.* at 520. Any improprieties in defense counsel's closing are more appropriately addressed by an objection from the prosecutor or intervention by the judge, sua sponte. *Id.* at 519.

Applying the four factors here, we think the first weighs in favor of the Commonwealth, as the defendant did not object. "Although not dispositive of the issue, the absence of [an objection] from experienced [defense] counsel is some indication that the tone, manner, and substance of the now challenged aspects of the prosecutor's [closing] argument were not unfairly prejudicial." *Commonwealth* v. *Duguay*, 430 Mass. 397, 404 (1999), quoting *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985). See *Commonwealth* v. *Kozec, supra* at 518 n.8.

The second factor weighs in favor of the defendant. As previously discussed, there was no dispute that the victim was murdered. The issue was the identity of the murderer. To the extent that the defendant claimed Cooper was the shooter and that this was the

main thrust of the defense, there was no evidence to support the claim, and the prosecutor's misstatement could not have eviscerated something that did not exist. However, to the extent that the prosecutor's misstatement may have bolstered Cooper's credibility, it supported the Commonwealth's claim that the defendant, who was tried on a theory of joint venture, was present and participated in the crimes, because Cooper was a key witness placing the defendant at the scene. The misstatement went to a critical issue in the case, the credibility of Cooper as a witness, and not just a collateral matter.

The third factor weighs in favor of the Commonwealth. The judge instructed the jury both at the beginning of the trial and in her general instructions at the end of the trial that the closing arguments of the lawyers were not evidence or a substitute for the evidence, and that it was their collective memory of the testimony that controls, not what the lawyers or indeed what she, the judge, might recall the testimony to have been. The jury are presumed to follow the judge's instruction. See *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990).

We turn to the fourth factor, whether the prosecutor's mistake possibly made a difference in the jury's conclusions. We conclude that it did not. The trial was relatively brief. The time from opening statements of counsel to the commencement of jury deliberations was just under forty-eight hours. The testimony was most likely fresh in the minds of the jury, and they were permitted to take notes. In addition, the closing arguments were in direct conflict as to Rich's testimony, so the jury must have been alerted to the factual dispute. The judge's instruction that closing arguments were not evidence and that the jury's collective memory of the testimony was controlling, together with the prosecutor's own admonition, immediately before his misstatement, that the jury's memory of Rich's statement controlled, likely removed any possibility of prejudice. See *Commonwealth* v. *Pope, supra.* There was no substantial likelihood of a miscarriage of justice.

5. *Judge's instruction.* The defendant asserts error in a portion of the judge's instruction to the jury after she directed them to draw no inference adverse to the defendant from the mere fact that police had a photograph of him, which had been included

in a photographic array presented to Nelson.[6] Immediately after the testimony about the photograph, the judge instructed the jury as stated, and further instructed the jury that police departments collect photographs from many different sources and for many reasons not connected with criminal investigations, such as applications for "identification cards, or hackney licenses, or fishing permits." The defendant correctly asserts no error as to this instruction. See *Commonwealth* v. *McAfee*, 430 Mass. 483, 494 (1999); *Commonwealth* v. *Johnson*, 27 Mass. App. Ct. 746, 752 (1989). At the end of the trial, in her general instructions, the judge said "gun permits" where she earlier had said "fishing permits." She added in her general instructions, "You are not to speculate what the reason was in this case. The fact that the police may have had the defendant's picture does not mean that the defendant committed this or any other crime." There was no objection. The defendant now argues that this instruction permitted the jury to infer that the police had the defendant's photograph because he had applied for a gun license, and such inference would have bolstered Cooper's testimony that the defendant had a gun that he used to shoot the victim. We review to determine whether any error, by the judge or counsel, created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

The judge's use of the illustration of the gun license is unfortunate, but it is unlikely that the jury drew the inference now claimed by the defendant. The judge instructed the jury several times that they must decide the case solely on the evidence. She defined evidence as the testimony of the witnesses as the jury recalled it, and any documentation or things received in evidence as exhibits. The judge also identified certain occurrences at trial that were not evidence, and which the jury were not permitted to consider as evidence in deciding the facts of the case. Among these was a directive that her "instructions and anything that I may have said in passing during the trial are not evidence." The jury are presumed to follow that instruction. *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990). Even if we assume the judge's

---

[6]There was evidence that Nelson selected the defendant's photograph from the array presented to her in May, 2000.

instruction was erroneous, it did not create a substantial likelihood of a miscarriage of justice.

6. *Relief pursuant to G. L. c. 278, § 33E.* We have considered the entire record and the defendant's arguments, and discern no reason to reduce the defendant's murder conviction to a lesser degree of guilt or to order a new trial.

*Judgments affirmed.*